**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DARRYL WILLIAMS**

        **Plaintiff,**

**-vs-**                                     **Case No.  6:04-cv-1879-Orl-19KRS**

**THE CITY OF DAYTONA BEACH, a municipal corporation and political subdivision of the State of Florida; CHIEF KENNETH SMALL, Chief of Police of the Daytona Beach Police Department, in his official capacity; OFFICER G.A. SAULT, OFFICER C. VAHEY, OFFICER B. ALLEN, OFFICER S. GOSS, OFFICER RUFF, and SERGEANT M. BURKETT, individually and as agents and employees of the Daytona Beach Police Department**

                **Defendants.**

_____

## ORDER

This case comes before the Court on the following:

1.      Defendants' Motion for Summary Judgment (Doc. No. 53, filed on December 1, 2005);

2.      Affidavit of Christopher Vahey (Doc. No. 54, filed on December 1, 2005);

3.      Affidavit of Gary Sault (Doc. No. 55, filed on December 1, 2005);

4.      Affidavit of James Michael Burkett (Doc. No. 56, filed on December 1, 2005);

5.      Affidavit of William Brian Allen (Doc. No. 57, filed on December 1, 2005);

6.      Affidavit of Scott Goss (Doc. No. 58, filed on December 1, 2005);

-1-

7. Affidavit of Sergeant Michael Griffin (Doc. No. 59, filed on December 1, 2005);

8. Deposition of Darryl Williams (Doc. No. 62, filed on December 1, 2005);

9. Notice of Filing Videotape and Attached Videotape (Doc. No. 63, filed on December 1, 2005);

10. Plaintiff Darryl Williams' Response to Defendants' Motion for Summary Judgment (Doc. No. 66, filed on January 4, 2006); and

11. Plaintiff Darryl Williams' Notice of Filing Exhibits in Paper Form and Attached Exhibits (Doc. No. 68, filed on January 5, 2006).

## Background

Darryl Williams ("Williams") testified that on January 15, 2002, he "worked out"on his legs for an hour and a half in the morning and then went to the Ocean Deck Restaurant for lunch with a lady named Gina whom he had not previously met.  (Doc. No. 62, "Darryl Williams Deposition," pp. 39, 40).  Williams later returned to his father's home on 116 Emmett Street in Daytona Beach, Florida where Williams had lived from 2001 until 2002 or 2003.  (*Id.* at 25, 41).  Around one o'clock in the afternoon, Williams drank "a couple of beers" in the house over an hour and a half period.[1]  (*Id.* at 42,

---

[1] Williams testified that he drank two beers, but it is unclear from the record whether the two beers were eight-ounce cans or twelve ounce cans:
 Q: So, it was around 1:00 o'clock that you had a couple of beers?
 A: Two beers.
 Q: Two beers.  And are these 12-ounce cans of beer?
 A: Eight ounce cans of beer.
 Q: Eight ounce cans of beer.
 A: Twelve, eight, the short ones.
 Q: I don't know if I've ever seen any eight-ounce cans of beer.
 A: It might not be eight.  It might be 12.  The short cans.
 Q: It's not a–I think 16 ounces are the tall ones, right?
 A: Okay.
 Q: So it was a 12-ounce can of beer, two of them...."

43).  At three o'clock in the afternoon, Williams' girlfriend, Frances McGruder, visited the Emmett

Street home and informed Williams she knew that he had been with another woman for lunch.  (*Id.* at

42).  McGruder angrily took the ignition key to Williams' car from him and said that she wanted to

make sure that he could not go anywhere else that day.  (*Id.*)  (*see also* Doc. No. 68, Ex. 79, "Affidavit

of Frances McGruder").

Williams remained at home with his father watching television during the afternoon.  (Doc. No.

62, p. 42); (*see also* Doc. No. 68, Ex. 80, "Affidavit of Raphael Williams").  Around seven o'clock in

the evening, Williams went outside with a book to read in his car.  (Doc. No. 62, p. 42).  He read the

book for about 45 minutes before falling asleep in the driver's seat.  (*Id.* at 48, 49).  Around ten

o'clock that evening, Officers Vahey and Ruff tapped on the window of Williams' car, looked inside

with a flashlight, and asked Williams for his driver's license and insurance information, which

Williams supplied.  (*Id.* at 55, 56, 57).  Williams told them that he was a corrections officer at the

Seminole County Juvenile Detention Center and that he lived at the address where he was parked.

(*Id.* at 57).  According to Williams, one of the officers said that he was lying about living at Emmett

Street because the address on his driver's license did not match the address where the car was parked.

(*Id.* at 58).

Officers Vahey and Ruff returned to their patrol car and subsequently brought Williams'

license back because everything "checked out."  (*Id.* at 59).  Williams then exited the vehicle and

began opening his trunk to show the officers his badge and uniform so they would not think he was a

vagrant sleeping in his car.  However, one of the officers told him that they wanted him to take a field

sobriety test.  (*Id.* at 59-60).  Williams responded that he "didn't have the ignition keys to the car" and

_____

(Doc. No. 62, pp. 42-43).

"showed him the keys" that Williams had in his possession. (*Id.* at 59). Before Williams exited the vehicle, a set of keys was located on the passenger seat with his book. (*Id.* at 60). Williams also speculated that he did not think he had the smell of alcohol on his breath but admitted that he did not know for sure one way or the other. (*Id.* at 65, 66).

According to his affidavit, Officer Sault subsequently arrived at the scene, and Williams told Sault that he did not have the ignition key to the car. (*Id.* at 62). When Officer Sault began to tell Williams what he wanted him to do, Williams responded that he had been working out on his legs, that they were sore, and that he was not sure whether he could stand on his leg. (*Id.* at 63-64). Officer Sault then recorded the field sobriety test on video.[2] (*Id.* at 64) (*See also* Doc. No. 63). Sault first asked Williams whether he had any medical problems, and Williams stated that he suffered from diabetes. (Doc. No. 55, "Affidavit of Gary A. Sault," ¶ 6). Sault asked Williams what type of insulin he used and what his blood sugar level was to which Williams responded "human insulin" and that he was unsure of his blood sugar level.[3] (*Id.*)

Sault then began to administer several field sobriety tests to determine whether Williams was impaired. (*Id.* at ¶ 7). The first test administered was the horizontal gaze nystagmus test. (*Id.*) Sault observed that Williams lacked smooth pursuit in both eyes, had a distinct nystagmus at maximum deviation in both eyes, and had an angle of onset prior to 45 degrees in both eyes which are reliable indications of impairment. (*Id.*)

---

[2] The video shows Officer Sault conducting the sobriety test according to his affidavit and also shows Williams quickly backing away from the officers to an off-camera location when he was told to place his hands behind his back. (*See* Doc. No. 63). Williams testified that the videotape did not record all the incidents. (Doc. No. 62, p. 124).

[3] Williams testified that he does not have diabetes and that he did not tell the officers that he had diabetes. (Doc. No. 62, p. 67).

-4-

After administering the first sobriety exam, Sault asked how much Williams had to drink that night. Williams responded that he had consumed a couple drinks.  (*Id.* at ¶ 8).  Sault then administered instructions for the walk and turn exercise, but Williams responded that the exercise was "hard to do, even sober."  (*Id.* at ¶ 9).  During this exercise, Williams did not touch heel to toe on most steps, turned improperly, and lost his balance after the turn.  (*Id.*)  Williams walked back nine steps but did not even attempt to touch heel to toe.  (*Id.*)

Sault then administered the one leg stand exercise.  (*Id.* at ¶ 10).  Williams put his foot down on the ground at several points during the exercise before the thirty seconds had elapsed and claimed that he was unable to complete the exercise because his legs were sore from the workout earlier that day.  (*Id.*)

Next, Sault administered the alternate finger to nose exercise.  (*Id.* at ¶ 11).  Williams missed his nose once, used the wrong hand once, and used the pad of his finger instead of its end to touch his nose contrary to Sault's instructions.  (*Id.*)

After completing the sobriety tests, Sault determined that there was probable cause to believe that Williams was impaired and in violation of Florida Statutes, Section 316.193.  (*Id.* at ¶ 12).  Sault instructed Williams to place his hands behind his back and advised that he found Williams to be impaired and was arresting him for DUI.  (*Id.*)  Williams testified that he did not know whether his eyes exhibited a nystagmus gaze during the field sobriety test.  (Doc. No. 62, p. 66).  Williams further related that he thought that he did well on the one-leg stand exercise and that he performed all aspects of the field sobriety test well.  (*Id.*)  When asked to place his hands behind his back, Williams testified that he did not resist arrest and only refused to put his hands behind his back.  (*Id.* at 67, 68).  Williams stated that he was trying to explain to the officer that he passed the test and wanted to let his father

know what was going on.  (*Id.* at 68).  Williams claimed that while trying to explain his situation to the officers, Officers Vahey and Ruff walked behind him, jumped on his back, threw him to the ground, slammed him into the patrol car, and started to punch him in his back and stomach.[4]  (*Id.* at 68, 73, 74, 75) .  Officer Sault was also on top of Williams.  (*See id.* at 76).  Officers Sault, Vahey, and Ruff were the only officers on the scene at that time.  (*Id.* at 70, 71).

When Officers Allen and Goss and Sergeant Burkett subsequently arrived on the scene, Williams was against the car and had not yet been handcuffed.  (*Id.* at 71).  Williams testified that the first comment made by Officer Allen was "Goddamn, that's a big-ass nigger."  (*Id.* at 73).  Williams stated that the other officers responded, "Yes, he is."  (*Id.*)  Williams then asked the officers: "Whatever happened to professional courtesy?  This is not right.  I didn't do anything.  This is my house.  I live here."  (*Id.* at 74).

After being handcuffed, Williams testified that he did not refuse to enter the patrol car and spoke to the officers just for a moment before entering the car.  (*Id.* at 82, 83).  After Williams sat in the vehicle for a few minutes, he testified that the officers took him out of the patrol car.  (*Id.* at 83).  Officer Sault then asked Williams if he had purchased his car with drug money, and Williams told him that he was not a drug dealer and that he did not have the ignition key to the car.  (*Id.* at 84, 85).  Williams testified that Sault said that he "didn't give a damn if I had the keys or not, your black ass is going to jail 'cause all you niggers sell drugs and I know you bought this car with drug money, didn't you?"  (*Id.* at 85, 87).

Sault became angry and pushed him, causing Williams to lose his balance because he was

---

[4] Williams testified that he was not sure how many times the officers hit him.  (Doc. No. 62, p. 81).

handcuffed.  (*Id.* at 85).  Then Sault jumped on top of Williams, started to choke him, and the other five officers began punching and kicking him in the stomach and the back of his head.  (*Id.* at 85, 87, 88, 89, 90)  Williams was in a choke-hold for five or ten seconds, unable to breathe, and the officers kicked and hit him for five to ten seconds.  (*Id.* at 88, 92).  Williams then heard someone say , "I think that's his father coming."  (*Id.* at 85)  At that point, the officers lifted Williams from the ground and placed him back into the car.  (*Id.*)  Williams did not sustain any cuts but had a scrape on his elbow and back.  (*Id.* at 90, 91).  He did not seek any medical treatment.  (*Id.* at 92).

The officers' accounts of the arrest differ from Williams' account.  Officer Vahey testified that on January 15, 2002, he went to a residence on the 100 block of Emmett Street in the City of Daytona Beach to look for someone who had an outstanding arrest warrant.  (Doc. No. 54, "Christopher Vahey Affidavit," ¶ 2).  Vahey made contact at the residence and discovered that the person he was looking for no longer lived there.  (*Id.*)  As he and Officer Ruff were walking away from the residence, Ruff called his attention to a Chevrolet Camaro which had the driver's side window down.  (*Id.* at ¶ 3).  The weather was cold that evening, and every other parked car on that street had mildew [sic] or moisture on it except for the Camaro.  Officer Vahey shined his light inside the vehicle and observed a black male sleeping behind the wheel.  (*Id.*)  Vahey could not discern whether the individual behind the wheel was in distress, injured, or impaired, so he tried to wake him up to ascertain his status but received no response.  (*Id.* at ¶ 4).  Vahey then opened the door, causing the interior dome light to turn on, but the individual did not awaken.  (*Id.* at ¶ 5).  At that point, Vahey nudged the individual who woke up and looked at Vahey.  (*Id.*).  Vahey could smell alcohol on the man's breath, observed his glassy eyes, and noticed keys in his hand.  (*Id.*)

Vahey determined the ownership of the car and asked the man, identified as Darryl Williams,

for his license and registration, which Williams supplied.  (*Id.* at ¶ 6).  The address on the license did not match where Williams was parked, and Williams advised Vahey that his father lived at that location.  (*Id.*)  During the encounter, Vahey observed Williams get out of his car and open the hatchback with the keys that were in his hand.  (*Id.* at ¶ 7).  Officer Ruff then called Gary Sault from the DUI unit to conduct an investigation to determine whether Williams was impaired for possible charges of DUI.  (*Id.* at ¶ 8).

Officer Sault then administered a series of sobriety tests.  (Doc. No. 55, ¶ 7).  Sault testified that Ruff and Vahey assisted him in an attempt to place handcuffs on Williams, but Williams continued to struggle and swing his arms around.  (*Id.* at ¶ 13) (Doc. No. 54, ¶ 12).  Because Williams was so strong, Sault made a radio call for assistance.  (Doc. No. 55, ¶ 14).  While Sault, Vahey, and Ruff were waiting for additional officers to arrive, they did their best to restrain Williams by placing him face down on the hood of Sault's patrol vehicle, but Williams continued to resist by refusing to relax the muscles in his arms.  (*Id.* at ¶ 15) (Doc. No. 54, ¶ 12).  Williams kicked Sault in the shin and leg while he was struggling.  (Doc. No. 55, ¶ 16).  After a short time, the other officers arrived at the scene to assist.  (Doc. No. 55, at ¶ 17).  During the struggle to handcuff him, Williams was told at least four times to stop resisting, not to kick, and at least six times to relax.  (*Id.* at ¶ 19) (*see also* Doc. No. 56, "James Michael Burkett Affidavit," ¶ 6).  After Williams was placed in handcuffs, Williams initially refused to cooperate with the officers' attempt to place him in the back seat of Sault's patrol vehicle.  (Doc. No. 55,  ¶ 20) (Doc. No. 54, ¶ 15).  Then after he was placed in the back seat of the patrol car, Williams used racial epithets against the officers such as "redneck ass crackers," "mother fucking cracker" and, "the cracker driving this car."  (Doc. No. 55, ¶ 22).

After Williams was placed in the patrol vehicle, Vahey went to speak with Williams' father.

(Doc. No. 54, ¶ 16).  When Vahey told Williams' father that his son stated that he lived with him, the father replied, "[H]e doesn't live here, but he comes by every once in a blue moon."  (*Id.*)

Officers Allen, Sault, and Vahey and Sergeant Burkett testified that they did not strike or kick Williams and did not use any degree of force against Williams that was unreasonable or unnecessary.  (Doc. No. 54, ¶ 21) (Doc. No. 55, ¶ 27) (Doc. No. 56, ¶ 10) (Doc. No. 57, ¶5 ).  Officers Sault and Burkett stated that they did not use any weapons and only used that amount of force that was necessary and reasonable to restrain Williams and place him in custody.  (Doc. No. 55, ¶ 27) (Doc. No. 56, ¶ 10).  Officers Allen, Sault, and Vahey and Sergeant Burkett further testified that they did not observe any other officer kick or strike Williams or use any degree of force that was greater than necessary to place Williams in custody.  (Doc. No. 54, ¶ 22)(Doc. No. 55, ¶ 28) (Doc. No. 56, ¶ 11) (Doc. No. 57, ¶ 11).

Officer Goss testified that on January 15, 2002, at 10:52 p.m. he received a call for assistance over the police radio and responded to the scene of the call on Emmett Street in the City of Daytona Beach.  (Doc. No. 58, "Affidavit of Allen Scott," ¶ 2).  There, he observed several police officers and a black male seated in the back seat of Officer's Sault patrol vehicle.  (*Id.* at ¶ 3).  Goss realized that the suspect was in secure custody and determined it was not necessary for him to leave his patrol vehicle to assist the officers.  He left the scene and continued his patrol duty.  (*Id.* at ¶ 4).  Goss testified that he did not leave his patrol vehicle, that he did not come into contact or speak to Williams, and that he did not take part in the decision to arrest or detain Williams.  (*Id.* at ¶ 5).

After the arrest, Williams was taken to the police station where he refused to take an additional field sobriety test.  (Doc. No. 62, p. 86).  Williams eventually pled no contest to resisting arrest without violence, paid a fine, and agreed to attend anger management classes.  (*Id.* at 107).

On June 22, 2005, Plaintiff Darryl Williams filed an Amended Complaint against the City of

Daytona Beach, Chief Kenneth Small, Officers Sault, Vahey, Allen, Goss, and Ruff, and Sergeant

Burkett.  (Doc. No. 38).  Counts I-VI are claims against Defendants Sault, Vahey, Allen, Goss, Ruff,

and Burkett for violating 42 U.S.C. section 1983 by using excessive and unreasonable force against

Williams, arresting Williams without probable cause, and subjecting Williams to punishment without

the benefit of a trial by jury.  Counts VII and VIII are claims for deprivation of civil rights based on

supervisory liability against Defendants Small and Burkett.  Count IX is a false arrest and false

imprisonment claim against all Defendants, and Count X is an assault and battery claim against

Defendants Sault, Ruff, Vahey, Allen, Goss, and Burkett.  Count XI is a negligent training and

supervision claim against Defendants Small and the City of Daytona Beach.  Count XII is an

intentional infliction of emotional distress claim against Defendants Sault, Ruff, Vahey, Allen, Goss,

and Burkett, and Count XIII is a negligent infliction of emotional distress claim against all Defendants.

On December 1, 2005, Defendants filed a Motion for Summary Judgment.  (Doc. No. 53).

Defendants argue that: 1) the officers are protected by qualified immunity because the material

undisputed facts reveal that there was no constitutional violation and the officers did not violate clearly

established law; 2) the supervisory liability claims for civil rights deprivations must fail because there

is no custom or policy permitting unlawful arrests or the excessive use of force; 3) the state law claims

are barred by the doctrine of sovereign immunity; and 4) the intentional infliction of emotional distress

claim fails because none of the actions taken by the officers rise to the level necessary for such a claim.

Defendants submitted the affidavit of Sergeant Michael Griffin, Personnel and Training

Supervisor for the Daytona Beach Police Department, in support of their argument that the City of

Daytona Beach Police Department had proper training procedures and did not endorse a policy

condoning unlawful arrests or the excessive use of force.[5]  (*See* Doc. No. 59, "Affidavit of Sergeant

Michael Griffin," ¶2).  According to the affidavit, in January 2002, the Daytona Beach Police

Department had a policy requiring all law enforcement officers to complete law enforcement training

and certification prior to becoming a sworn law enforcement officer.  (*Id.* at ¶ 3).  Before being hired,

law enforcement officers are required to complete a course of study at an accredited police academy

and must obtain a certification by the Florida Department of Law Enforcement.  (*Id.*)  Once a law

enforcement officer is hired, he or she is required to undergo Field Training which includes five to six

weeks of classroom experience.  (*Id.* at ¶ 4).  After the five to six weeks of classroom training is

concluded, officers are assigned to patrol with an experienced field training officer for fourteen weeks.

(*Id.*)  Once the fourteen weeks is concluded, the officers are evaluated on a weekly basis until six

months of employment is reached.  (*Id.*)  At that time, the trainees are evaluated on a monthly basis

until the one-year anniversary date of entering service as a patrol officer.  (*Id.*)  After completing the

first year of service, the Daytona Beach Police Department has a mandatory continuing in-service

training requirement for all law enforcement officers.  (*Id.* at ¶ 5).

Sergeant Griffin authenticated by affidavit Daytona Beach Police Department General

Directive Number 13.1 which was the use of force policy in effect on January 15, 2002, the date of

Williams' arrest.  (*Id.* at ¶ 7).  Sergeant Griffin testified that the "Daytona Beach Police Department

does not have now, or at the time of the Plaintiff's arrest, a custom, policy or practice which condoned

or permitted officers to violate any clearly established constitutional right of any suspect or individual

who was arrested, or permitted or condoned the use of excessive force during the arrest of any

---

[5] Plaintiff also submitted the deposition of Sergeant Michael Griffin.  (*See* Doc. No. 68, Attached Deposition Exhibit).

individual."  (*Id.* at ¶ 8).

On January 4, 2006, Plaintiff Darryl Williams filed a Response to Defendants' Motion for Summary Judgment.  (Doc. No. 66).  Williams argues that: 1) Defendants are not entitled to qualified immunity because Defendants lacked probable cause to believe that Williams committed a crime, Defendants used excessive force on him, and Defendants violated clearly established law; 2) Plaintiff has produced sufficient evidence to demonstrate a pattern or practice of violating civil rights such that the City of Daytona Beach has a policy or procedure of condoning these actions; 3) sovereign immunity does not apply to the state law claims; and 4) Defendants are not entitled to summary judgment on the intentional and negligent infliction of emotional distress claims.  In support of his argument that the City has a custom or policy of violating the Constitution, Plaintiff has submitted seventy-seven exhibits which detail complaints and investigations into complaints directed to City of Daytona Beach police officers.

## **Motion for Summary Judgment**

### **Standard of Review**

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.*  The moving party bears the burden of proving that no genuine issue of material fact exists*. Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  The plain language of Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  Under such circumstances, there can be no genuine issue of material fact because a complete absence of proof regarding a critical element of the nonmoving party's case renders all other facts immaterial.  *Id.* at 323.

In determining whether the moving party has satisfied the burden, the Court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court may not weigh conflicting evidence or weigh the credibility of the parties.  *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted).  If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the Court must not grant summary judgment.  Id. (citation omitted)

## Analysis

### *1. Admissibility of Plaintiffs' Seventy-Seven Exhibits*

In support of his argument that the City has a custom or policy of sanctioning false arrests and the excessive use of force, Plaintiff has submitted seventy-seven exhibits which are dated over a nine year period.  These exhibits detail complaints and investigations into complaints of officers at the City of Daytona Beach Police Department.  At issue in the instant case is whether these exhibits have been properly authenticated.

Federal Rule of Evidence 901 provides that authentication of an exhibit is a condition precedent to its admissibility.  FED. R. EVID. 901(a).  There are several avenues by which memoranda and letters may be authenticated.

First, authentication of exhibits like memoranda and letters can be accomplished by the

submission of evidence sufficient to support a finding that the matter in question is what its proponent

claims.  *Id.*  However, Plaintiff has not submitted the testimony of a witness with knowledge that the

alleged letters and alleged memoranda are what they are claimed to be.  *See* FED. R. EVID. 901(b)(1).

Thus, the exhibits have not been properly authenticated pursuant to Federal Rule of Evidence

901(b)(1).

Second, authentication may be accomplished if there is evidence that the memoranda and

letters are writings authorized by law to be recorded or filed and were in fact recorded or filed in a

public office or if the memoranda and letters constitute a public record, report, statement, or data

compilation, in any form and are from the public office where items of this nature are kept.  FED. R.

EVID. 901(b)(7).

Florida Statutes, Section 112.533(1) provides that every law enforcement agency shall establish a

system for the receipt, investigation, and determination of complaints received by the agency.  FLA.

STAT. § 112.533(1) (2002).  There is no stamp or seal on the face of the exhibits that identifies them as

having been a public record.  Even more importantly, Plaintiff has not submitted any evidence in the

form of testimony from a custodian of records that the memoranda and letters were in fact recorded or

filed in a public office.  Therefore, the exhibits are not admissible pursuant to Federal Rule of

Evidence 901(b)(7).

While the exhibits are not admissible under Federal Rule of Evidence 901, the exhibits may be

properly admitted into evidence if they are self-authenticating under Federal Rule of Evidence 902.

First, a document bearing a seal of the United States, a state, district, Commonwealth, territory, or of a

political subdivision, department, officer, or agency thereof, and a signature purporting to be an

attestation or execution is properly authenticated.  FED. R. EVID. 902(1).[6]  In the instant case, the

memoranda merely contain a box at the top stating "Daytona Beach Police Department" and do not

contain a seal.  Even more importantly, several of the documents do not contain a signature.  (*See* Doc.

No. 68, Ex. 4, 11, 14, 34, 44, 73).  While the letters from complainants are signed, they do not contain

a seal of the State of Florida or the City of Daytona Beach.  Because the memoranda and letters either

lack a signature or seal, or both, the exhibits are not self-authenticating under Rule 902(1).

Federal Rule of Evidence 902(2) permits the self-authentication of domestic public documents

not under seal.  A document purporting to bear the signature in the official capacity of any officer or

employee of any entity described in Rule 902(1) is self-authenticating even without a seal if a public

officer having a seal and having official duties in the division of the officer or employee certifies under

seal that the signer has the official capacity and that the signature is genuine.  FED. R. EVID. 902(2).

However, many of the memoranda do not contain a signature, and none have a certification under seal

attesting to the fact that the signers of the documents acted in their official capacities and that the

signatures are genuine.

Rule 902(4) provides the third avenue through which exhibits may be self-authenticated.  A

copy of an official record or report or a document authorized by law to be recorded or filed and

actually recorded or filed in a public office is self-authenticating if certified as correct by the custodian

by a certificate complying with Rules 902(1), (2), or (3), or complying with any Act of Congress or

---

[6] A public document is broadly defined to include all writings in the custody of a public entity, regardless of private or public authorship and regardless of the legal authorization for filing the document.  *See, e.g.,* CHARLES ALAN WRIGHT & ARTHER R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 7135 (2005).  The memoranda and the letters from the complainants fit this definition.

rule prescribed by the Supreme Court pursuant to statutory authority. Fed. R. Evid. 902(4). Because there is no certification from a custodian of record, the exhibits in the instant case are not self-authenticating under Rule 902(4).

Therefore, Plaintiffs' seventy-seven exhibits at Docket Number 68 have not been properly authenticated and are not self-authenticating. The exhibits are inadmissible as evidence in analyzing Defendants' Motion for Summary Judgment. *See Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

### *2. Defendants' Argument that Officer Goss is Entitled to Summary Judgment on all Claims against Him Because He Never Participated in the Arrest*

While Officer Goss testified that he never participated in the arrest and merely continued his patrol when he realized that the situation was under control, Plaintiff testified that all six officers participated in the beating, though Plaintiff did not identify the officers by name. (Doc. No. 62, pp. 89-90).[7] Because there is a genuine issue of material fact as to whether Officer Goss was at the scene of the arrest, Defendants' motion for summary judgment in favor of Officer Goss on the ground that he never participated in the arrest must be denied.

---

[7] Plaintiff testified that all six officers were kicking and punching him:
Q: And then the other two officers or the–or how many other officers joined in?
A: It was six officers on the scene.
Q: So all–all the officers.
A: All of them was kicking and punching me.
Q: So all the other five officers that were standing there came over or assisted in kicking or hitting you.
A: Yes.
Q: Do you know specifically which of the officers hit or kicked you when you were on the ground when Officer Sault had you in this choke-hold?
A: No, But all of them was kicking. I seen–I looked up–I know all–everybody was kicking and punching me.
(Doc. No. 62, pp. 89-90).

### 3. Defendants' Argument that the Defendant Officers did not deprive Plaintiff of his Right to be Free from Unlawful Arrest

Plaintiff alleges a false arrest claim against Defendants Sault, Vahey, Allen, Goss, Ruff, and Burkett.  Defendants argue that Plaintiff was not deprived of his right to be free from an unlawful arrest because Defendant officers had probable cause to arrest Plaintiff for violating Florida Statutes, Sections 901.15, 316.193, 843.01, and 843.02.

Section 901.15(5) provides that an officer may arrest a person without a warrant when a violation of chapter 316 has been committed in the presence of the officer.  FLA. STAT. § 901.15(5) (2001).  Defendants cite Section 316.193, the DUI statute, as the specific statutory provision violated by Plaintiff.[8]  Section 901.15(1) provides that a law enforcement officer may arrest a person without a warrant when the person has committed a felony or misdemeanor or violated a municipal or county ordinance in the presence of the officer.  FLA. STAT. § 901.15(1) (2001).  Defendants argue that Defendant officers had probable cause to arrest Plaintiff for resisting arrest with violence, a felony of the third degree, under Florida Statutes, Section 843.01.  Defendants further claim that Defendant officers had probable cause to arrest Plaintiff for resisting arrest without violence, a misdemeanor of the first degree, under Florida Statutes, Section 843.02.

---

[8] Florida Statutes Section 316.193 states:
(1) A person is guilty of the offense of driving under the influence and is subject to punishment as provided in subsection (2) if the person is driving or in actual physical control of a vehicle within this state and:
(a) The person is under the influence of alcoholic beverages, any chemical substances set forth in s.877.111, or any substance controlled under chapter 893, when affected to the extent that the person's normal faculties are impaired;
(b) The person has a blood-alcohol level of 0.08 or more grams of alcohol per 100 milliliters of blood; or
(c) The person has a breath-alcohol level of 0.08 or more grams of alcohol per 210 liters of breath.
FLA. STAT. § 316.193 (2001).

Plaintiff counters that the Court should not grant summary judgment in favor of Defendants because Plaintiff did not resist arrest either with or without violence.  Furthermore, Plaintiff claims that he was not in violation of Section 316.193(1) because he was not driving the car, was not able to drive the car because his girlfriend had the ignition key, and told the officers that he could not drive the car.

It is clear that an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment to the United States Constitution.  *See Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003) (internal citations omitted).  However, if the officer has "probable cause to believe that an individual has committed even a very minor criminal offense in his presence, [then] he may, without violating the Fourth Amendment, arrest the offender." *Id.* (internal citation and quotation marks omitted).  Plaintiff has the burden of proving that Defendant officers lacked probable cause to arrest him.  *See Cuesta v. Sch. Bd. of Miami-Dade County, Fla.*, 285 F.3d 962, 970 (11th Cir. 2002) (stating it was the plaintiff's burden to establish that the defendant lacked reasonable suspicion to strip search her).

Probable cause exists when an arrest is "objectively reasonable based on the totality of the circumstances." *Durruthy v. Pastor*, 351 F3d 1080, 1088 (11th Cir. 2003) (internal citations and quotation marks omitted).  An arrest is objectively reasonable when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal citation omitted).  While an arrest without probable cause is unconstitutional, police officers are entitled to qualified immunity if there was arguable probable cause for the arrest.  *Storck*, 354 F.3d at 1315.

Section 316.193 imposes liability on a person who is driving or who is in actual physical

-18-

control of the vehicle while under the influence of alcohol.  FLA. STAT. § 316.193 (2001).  Physical

control is defined as possessing the actual means to drive the vehicle.  For example, in *Griffin v. State*,

457 So.2d 1070, 1071 (Fla. 2d DCA 1984), a police officer found the defendant asleep in the driver's

seat of a stationary car that was in a traffic lane facing the wrong way.  The engine was stopped, the

key was in the ignition, the lights were on, and the footbrake was depressed by the defendant's foot.

*Id.*  The Second District Court of Appeal denied the defendant's petition for writ of certiorari to review

the affirmance of the defendant's conviction for driving under the influence, reasoning that there was

circumstantial evidence that the defendant was in actual physical control of the car.  *Id.*  The Second

District Court of Appeal also found that the Florida legislature intended to make actual physical

control of a motor vehicle while under the influence of alcohol a crime in order to enable police

officers to apprehend a drunken driver before he strikes.  *Id.* at 1072.  An intoxicated person seated

behind the steering wheel of a vehicle is a threat to the safety and welfare of the public because a

legitimate inference could be drawn that he placed himself behind the wheel and could drive the

automobile away at any time.  *Id.*  (internal citation omitted).  The Second District Court of Appeal

further explained that physical control means that the defendant has the "capability and power to

dominate, direct or regulate the vehicle, regardless of whether or not he is exercising that capability or

power at the time of the alleged offense.'" *Id.*  (internal citation and quotations omitted).

The record reflects that Plaintiff was asleep in his car behind the steering wheel, that Officer

Vahey had difficulty waking Plaintiff, that Plaintiff's eyes were glassy and bloodshot, that he had the

smell of alcohol on his breath, that Plaintiff possessed a set of keys that were used to open the trunk,

that Plaintiff's driver's license did not match the address where the car was parked, that there was no

dew or moisture on Plaintiff's car while the other cars parked on that street had dew or moisture on

them, that Officer Sault determined that Plaintiff did not adequately perform the field sobriety tests, and that Plaintiff informed Officer Sault that he had a couple of drinks earlier that day.

From these undisputed facts, it is sufficient to infer that the officers had at least arguable probable cause to arrest Plaintiff for being in actual physical control of the vehicle while under the influence of alcohol.  While Plaintiff argues that he cannot be arrested under Section 316.193 because he was not driving the vehicle, was not in possession of the ignition key, and told the officers he did not have the ignition key, under the arguable probable cause standard Plaintiff may be arrested so long as the facts demonstrate that Defendant officers had reasonably trustworthy information which would cause a person to *believe* that Plaintiff has committed, was committing, or was about to commit the offense of being in actual physical control of the vehicle while under the influence of alcohol.  Since Plaintiff possessed a set of keys and one of the keys was used to open the trunk, it would be reasonable to believe that a key that opens the trunk of a vehicle, or one of the other keys in the set, could be used to drive the vehicle.  Also since Plaintiff was seated behind the steering wheel of the car and the set of keys was on the passenger seat, a reasonable officer could infer that Plaintiff would be able drive away under these circumstances.

Further, Officer Sault concluded that Plaintiff had failed the field sobriety test.  Thus, even though Plaintiff testified that he did not possess the ignition key and so stated to the officers, the officers were not required to believe Plaintiff and to set aside all the other factors they observed. Given these facts, a legitimate inference could be drawn that Plaintiff had placed himself behind the wheel of the vehicle and was able to drive away at any time.  Therefore, summary judgment in favor of

Defendants is appropriate on the false arrest claim under 42 U.S.C. section 1983.[9]  *See, e.g., State v. Boynton*, 556 So.2d 428 (4th DCA 1989) (defendant was in actual physical control of vehicle where defendant was found slumped over the steering wheel of automobile parked in the parking lot of a restaurant, defendant was sleeping or passed out while sitting in the driver's seat with his left hand on the steering wheel, keys were in the ignition but engine was not running).

Defendants further argue that there was probable cause to arrest Plaintiff for resisting arrest both with and without violence.  As to probable cause to arrest Plaintiff for resisting arrest without violence, the record reflects that Plaintiff admits that he did not place his hands behind his back when asked to do so.  (*Id.*)  Because failing to present one's hands for handcuffing is sufficient evidence to establish probable cause for the charge of resisting arrest without violence, summary judgment in favor of Defendants is appropriate on Plaintiff's claim that he was unlawfully arrested under 42 U.S.C. section 1983 on this additional ground.  *See, e.g., Savage v. State*, 494 So.2d 274, 277 (Fla. 2d DCA 1986) ("One can resist, obstruct, or oppose an officer without committing a battery, for example, a person might struggle with an officer or refuse to present one's hands for handcuffing, or refuse to lie down when ordered, or refuse to put one's arm behind one's back, or refuse to get in a squad car when ordered to do so.").

However, there is testimony sufficient to create a genuine issue of material fact as to whether Defendant officers had probable cause to arrest Plaintiff for resisting arrest with violence.  While the

_____

[9] In the instant case, the officers had a series of factors upon which to conclude that Plaintiff was impaired, including but not limited to: the car appeared to have been recently driven, the car was parked on the street with other cars, the window of the car was down at 10:00 p.m. on a cold night in January, a person was in the driver's seat of the car and was non-responsive to the officers' initial inquiry, and the person had the odor of alcohol, glassy eyes, and difficulty waking up.

Defendant officers testified that Plaintiff actively resisted arrest and that it took five officers to ultimately subdue Plaintiff, Plaintiff testified that he never used force against the officers.  (Doc. No. 62, pp. 67, 68).

### 4.  *Defendants' Argument that Defendant Officers did not Deprive Plaintiff of his Right to be Free from the Use of Excessive Force*

Plaintiff asserts excessive force claims against Defendants Sault, Vahey, Allen, Goss, Ruff, and Burkett.  Defendants argue that the doctrine of qualified immunity bars the excessive force claim because when Defendant officers' actions are considered from their perspective, the Court must conclude that the amount of force used was reasonable.  Defendants also claim that even if the Court concludes that Defendant officers violated the Constitution, qualified immunity still applies because there was no clear prohibition against the use of this particular type of force.  Plaintiff counters that he never resisted arrest and that the record reflects he was taken to the back of a police car and beaten by six officers while he was handcuffed.  Plaintiff further argues that Eleventh Circuit case law clearly prohibits Defendant officers' conduct.

To receive qualified immunity, the public official must first demonstrate that he was acting within the scope of his discretionary authority when the wrongful acts occurred.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  In the instant case, there is no dispute that Defendant officers were acting within the course and scope of their discretionary authority when arresting Plaintiff.  Once the defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.  *Id.*  The first step of this inquiry requires the Court to determine whether the plaintiff's averments, if true, establish a constitutional violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2002).

All claims that law enforcement officers have used excessive force in the course of an arrest,

investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether the force is reasonable hinges on the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The "calculus of reasonableness" must embody allowance for the fact that police officers are often forced to make split-second judgments in tense, uncertain, and rapidly changing situations. *Id.* at 396-97.

The Eleventh Circuit has interpreted the Supreme Court's language in *Graham* as requiring the balancing of three factors in determining whether the force applied was reasonable: the need for the application of force, the relationship between the need and amount of force used, and the extent of injury inflicted. *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004).

There are two separate instances in which force was used in the instant case. The officers used force to effectuate the arrest and also used force after the arrest had taken place. Regarding the first instance, Plaintiff testified that he refused to place his hands behind his back and that Officers Vahey and Ruff threw him to the ground, slammed him into a car, and punched him in his back while Officer Sault was on top of him. While Defendant Officers testified that Plaintiff actively resisted arrest, the Court draws all reasonable inferences in favor of Plaintiff in conducting the analysis.

Applying the *Graham* factors to the facts of the instant case, Plaintiff could have posed a threat to the safety of the officers or others because Defendant officers believed that Plaintiff was in physical control of the vehicle while under the influence of alcohol and that Plaintiff could endanger others if

he decided to drive the vehicle.  The crime at issue, being under the influence of alcohol while in

control of a vehicle, carries a strong potential for significant bodily harm or death.  Finally, while

Plaintiff testified that he did not use physical force against the officers, the record reflects that Plaintiff

resisted arrest by refusing to place his hands behind his back.  (Doc. No. 62, pp. 67, 68).  Thus,

Officers Vahey, Sault, and Ruff were faced with a situation in which Plaintiff refused to cooperate

with them in the arrest and in which they reasonably believed that he possessed the capacity to drive

away in his car while under the influence of alcohol.

Examining the Eleventh Circuit's articulation of the *Graham* factors in *Draper*, there was a

need for Officers Vahey, Sault, and Ruff to apply force because Plaintiff refused to cooperate by

placing his hands behind his back.  Regarding the amount of force used, while one may argue that less

force could have been used to subdue Plaintiff, the amount of force used is de minimis in light of the

fact that Plaintiff did not suffer any injuries.  *See, e.g., Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir.

2000) (use of force held to be de minimis where officer grabbed the plaintiff and shoved him a few feet

against vehicle, pushed knee in the plaintiff's back and plaintiff's head against van, and handcuffed

him); *see also Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir. 1997) (use of force deemed de

minimis where officers slammed the plaintiff against the wall, kicked his legs apart and required the

plaintiff to raise his hands above his head as officers carried out arrest).  Therefore, on the record

presented, Defendant officers did not use excessive force in effectuating the arrest.

Plaintiff testified that after he was handcuffed, Officer Sault pushed and choked him while the

other officers jumped on top of him and punched and kicked him.  Applying the *Graham* factors to

these facts, Plaintiff no longer posed a threat to the officers or others because he had been handcuffed.

Plaintiff testified that he was not resisting the officers at that time.  Under *Draper*, there appears to be

no need for any application of force where Plaintiff was under arrest, handcuffed, and not resisting.  If true, the amount of force used by the officers, in this case punching, kicking, and choking, is clearly excessive in light of the fact that there was no need to use such force.  Because Plaintiff has testified that the officers applied a substantial amount of force while he posed no threat to the safety of the officers or others and there was no necessity for the use of such force, the Court cannot grant summary judgment on Plaintiff's allegation that Defendant officers used excessive force after Plaintiff was arrested.  *See, e.g., Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (finding that officers used excessive force where witnesses testified that the plaintiff did not struggle or resist the officers in any way and that the officers kicked him in the ribs and beat his head on the ground while the plaintiff was handcuffed).

Having found that the record could support a violation of the Fourth Amendment's prohibition against the use of excessive force after Plaintiff was arrested, the second step of the qualified immunity analysis will be examined which requires the Court to determine whether the right was clearly established.  *Vinyard v. Wilson*, 311 F.3d 1340, 1349 (11th Cir. 2002).  In *Saucier v. Katz*, the Supreme Court stated that the relevant query is whether it "would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted."  533 U.S. at 202 (emphasis added).  In *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), the Supreme Court refined the *Saucier* query, holding that the "salient question ...is whether the state of the law...gave [the officers] fair warning that their alleged treatment [of the plaintiff] was unconstitutional."  (emphasis added).  The *Hope* Court emphasized that officers sued in a section 1983 action have a "*right to fair notice*."  *Id.* at 739 (emphasis added).

Fair notice can be given in three ways.  *Vinyard*, 311 F.3d at 1350-53.  First, the words of the federal statute or federal constitutional provision may be specific enough to establish clearly the law

applicable to particular conduct and circumstances to overcome qualified immunity.  *Id.* at 1350.

Second, if the conduct is not so egregious as to violate the plain language of a statute or constitutional

provision on its face, then the Court turns to case law.[10]  *Id.* at 1351.  If there is no case law with a

broad holding that is not tied to a particular set of facts, then the Court examines precedent that is tied

to the facts.  *Id.* at 1351.  Most judicial precedents are tied to particular sets of facts and fall into this

category.  *Id.* at 1351-52.

Defendants argue that there was no clear prohibition against the type of force employed in the

instant case and that the use of force only resulted in a de minimis injury to Plaintiff.  Defendants cite

*Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000), *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir.

2002), *Jones v. City of Dothan*, 121 F.3d 1456, 1460-61 (11th Cir. 1997), *Taylor v. McDuffie*, 155 F.3d

479 (4th Cir. 1998), *Foster v. Metro Airports*, 914 F.2d 1076, 1082 (8th Cir. 1999), *Martin v. Gentile*,

849 F.2d 863, 869 (4th Cir. 1988), and *Curd v. City Court*, 141 F.3d 839, 841 (8th Cir. 1998) in

support of their argument.  These cases are distinguishable from the instant case.

In *Nolin, Rodriguez, Jones, Foster, Martin,* and *Curd*, the officers used force to effectuate an

arrest.  The appellate courts in those cases all concluded that the amount of forced use to make the

arrest was reasonable.  For example, the Eleventh Circuit in *Nolin* found that the defendant officer's

---

[10] Broad principles may not be tied to particular facts and can clearly establish law
applicable in the future to different sets of detailed facts.  *Vinyard*, 311 F.3d at 1351.  If a case
determined that a particular type of conduct was unconstitutional without linking that conduct to
a specific set of facts, the decision as to that conduct clearly establishes a constitutional
principle.  *Id.*  In the absence of fact-specific case law, the plaintiff may defeat the qualified
immunity defense when the general principle applies with obvious clarity to the specific conduct
in question, and it must have been obvious to a reasonable police officer that the pertinent
conduct given the circumstances was unconstitutional at the time.  *Id.* at 1352.  (internal citation
and quotations omitted).

action of grabbing the plaintiff from behind by the shoulder and wrist, throwing him against a van three or four feet away, kneeing him in the back, pushing his head into the side of the van, searching his groin area in an uncomfortable manner, and handcuffing him was de minimis.  207 F.3d at 1258. In *Rodriguez*, the Eleventh Circuit found that the defendant officer's actions of grabbing, twisting, and forcing the plaintiff's arm up to just below the shoulder blade was an ordinary handcuffing technique that did not violate the Fourth Amendment because painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.  208 F.3d at 1351-53.  In *Jones*, the Eleventh Circuit found that the defendant officers' actions of slamming the plaintiff against a wall, kicking his legs apart, requiring him to put his arms above his head, and pulling his wallet from his pants pocket were reasonable and that the application of the excessive force standard would not inevitably lead an official in the officers' position to conclude that the force was unlawful.  121 F.3d at 1460-61.  In *Foster*, the Fourth Circuit found that the defendant officers' actions of forcibly pulling the plaintiff out of his car, handcuffing him, pushing him against an elevator, and roughing him up did not constitute excessive force because he presented no medical records indicating that he suffered any long-term injury.  914 F.2d at 1082.  In *Martin*, the Fourth Circuit held that the defendant officers' actions of ramming a gun through the plaintiff's window and throwing the plaintiff out of his car onto the glass-covered pavement while one officer sat on the plaintiff's back allowing the other officer to beat him on the head did not constitute excessive force where the record indicated that the officers had a valid arrest warrant and had probable cause to arrest the plaintiff for violent rapes, where the plaintiff was suspected of being armed and dangerous, and where the plaintiff violently resisted arrest.  849 F.2d at 869-70.  In *Curd*, the Eighth Circuit found that the defendant officer's action of seizing the plaintiff's arm and turning around her body was reasonable because the amount of force used was slight and there

-27-

was no evidence that the plaintiff was injured or experienced physical pain. 141 F.3d at 841.

Inapposite to these cases which focus on the Fourth Amendment's reasonableness analysis, *Taylor*, a Fourth Circuit case cited by Defendants, focuses on the propriety of the use of excessive force where the plaintiff was already in custody at the police station. 155 F.3d at 483. Because the plaintiff's claims in *Taylor* were analyzed under the Due Process Clause of the Fourteenth Amendment, *Taylor* is inapplicable to the instant claim.[11] While Defendants have cited a myriad of cases which they contend govern the outcome of the second prong of the qualified immunity analysis, Defendants have neglected to cite a case to the Court in which the use of force by officers was justified *after* the plaintiff was handcuffed, subdued, and cooperative.

On the other hand, Plaintiff cites *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000), and *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), in support of his argument that Defendant officers violated a right that was clearly established. In *Slicker*, the plaintiff was arrested for disorderly conduct and handcuffed. 215 F.3d at 1227. The defendant officer grabbed the plaintiff's head, and another officer pulled the handcuffs behind the plaintiff's back. *Id.* The first officer then slammed plaintiff's head into the pavement which caused the plaintiff to lose consciousness. *Id.* When the plaintiff eventually regained consciousness, he felt two blows to the top of his head and asked the officers not to hurt his

---

[11] In *Taylor*, the plaintiff was arrested for drunk and disorderly conduct and taken for processing to the county jail. 155 F.3d 480. The plaintiff claimed that the defendant officer became upset when he refused to provide his girlfriend's name and driver's license which the plaintiff admitted were in his possession. *Id.* at 481. According to the plaintiff, the officer threatened to "blow his brains out," threw him to the floor, jumped on his back and searched his pockets, hit him on the back of the head, punched him in the ribs, kneed him in the back and shoved a small wooden object into his nose. *Id.* Analyzing the plaintiff's claim under the Due Process Clause of the Fourteenth Amendment, the Fourth Circuit found that the plaintiff had failed to show that his injuries resulting from such use of force were more than de minimis. *Id.* at 483. The Fourth Circuit further reasoned that the plaintiff's medical records did not support the injuries that he purportedly received. *Id.*

neck.  *Id.*  The officers then kicked the plaintiff in the back and in the back of his head.  *Id.*  The

plaintiff was treated at a hospital emergency room and testified that he sought medical treatment after

he left the emergency room, though no medical bills were offered into evidence.  *Id.*  The plaintiff did

not claim that he missed work or incurred any other direct monetary loss as a result of the officers'

conduct.  *Id.*  In analyzing the plaintiff's excessive force claim under the Fourth Amendment, the

Eleventh Circuit found the officers' actions of beating and hitting the plaintiff and knocking him

unconscious was excessive in light of the fact that the plaintiff was handcuffed and did not struggle.

*Id.* at 1233.

In *Lee*, the plaintiff was pulled over by an officer after honking her car horn at traffic.  284 F.3d

at 1190-91.  Before the plaintiff could retrieve her purse to show her license, the officer pulled the door

to her car open and put his retractable night stick in her face.  *Id.* at 1191.  The officer then grabbed the

plaintiff's left wrist, pulled her out of the car, and told her that she was under arrest.  *Id.*  Once the

officer had her outside of the car, he shoved the plaintiff against the driver's side door, frisked the

plaintiff, and handcuffed her.  *Id.*  The officer then led the plaintiff to the trunk of her car, slammed her

head down onto the trunk, and spread her legs with his foot.  *Id.*  The plaintiff did not resist the officer

at any time during the incident.  *Id.*  Three days after the incident, the plaintiff went to the hospital to

be treated for bruising and aching wrists.  *Id.*  A doctor diagnosed the plaintiff with bilateral wrist

trauma and believed that the plaintiff might be suffering from carpal tunnel syndrome which could be

permanent.  *Id.* at 1192.  The plaintiff claimed that the officer violated her right to be free from

excessive force under the Fourth Amendment.  *See id.* at 1197.

In analyzing the plaintiff's Fourth Amendment claim, the Eleventh Circuit cited *Slicker* for the

proposition that the facts of the plaintiff's case, similar to *Slicker*, went so far beyond the "'hazy

border between excessive and acceptable force that [the officer] had to know that he was violating the Constitution even without case law on point.'" (internal citation omitted).  *Id.* at 1199  In finding that the officer's actions had violated the Fourth Amendment, the appellate court distinguished *Rodriguez*, *Nolin*, and *Jones*, reasoning that not one of those opinions granting qualified immunity involved the infliction of such severe and disproportionate force after the arrest had been fully effected and the arrestee had been completely secured.  *Id.*  The appellate court also found unconvincing the defendant's argument that the force applied to the plaintiff was de minimis based on the fact that the plaintiff did not suffer a greater injury to the head.  *Id.* at 1200.  The Eleventh Circuit reasoned that "objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm."  *Id.*

Applying these principles to the instant case and viewing the evidence in the light most favorable to Plaintiff, the Court cannot find that Defendant officers did not violate Plaintiff's clearly established right to be free from excessive force after he was arrested and handcuffed.  Plaintiff testified that he was already handcuffed and did not resist when Officer Sault suddenly pushed him to the ground and choked him while the other officers jumped on top of him and punched and kicked his body.  While Plaintiff did not seek medical treatment, it cannot be said that punching, kicking, and choking a subdued and arrested individual is de minimis.  Because the facts of *Lee* and *Slicker* are similar to the facts of the instant case, Defendants are not entitled to qualified immunity on Plaintiff's claim of excessive force used after Plaintiff was handcuffed, secured, and not resisting arrest.


**5. *Plaintiff's Claim that Defendant Officers Subjected Plaintiff to Punishment without the Benefit of a Trial by Jury***

Plaintiff claims that Defendant officers have subjected him to punishment without the benefit of a trial by jury in violation of his rights under the Fourth Amendment.  This issue has not been briefed by the parties.

The right to a jury trial is guaranteed by the Sixth and Fourteenth Amendments.  *Duncan v. Louisiana*, 391 U.S. 145, 148 156 (1968).  A jury trial is required in all criminal trials or criminal contempt proceedings where imprisonment for more than six months is authorized or imposed.  *Muniz v. Hoffman*, 422 U.S. 454, 475-76 (1975).

On the record before the Court, Plaintiff is not entitled to relief for a violation of his Sixth Amendment right to a jury trial.  Plaintiff pled no contest to the charge of resisting arrest without force. There is also an absence of evidence in the record demonstrating how Defendant officers denied Plaintiff of his right to a jury trial.  Furthermore, Plaintiff's claim that excessive force was used against him is a claim under the Fourth Amendment and not a claim under the Sixth Amendment.  Because Plaintiff bears the burden of proof, has presented no argument or evidence, and there is no genuine issue of material fact as to whether Plaintiff is entitled to relief under the Sixth Amendment for his right to a jury trial, summary judgment in favor of Defendants on this claim is appropriate.

### 6. Defendants' Argument that Plaintiff cannot Demonstrate Supervisory Liability Against the City of Daytona Beach, Chief Kenneth Small, or Sergeant Burkett for a Violation of 42 U.S.C. Section 1983 by Defendant Officers

In Counts VII and VIII, Plaintiff asserts a supervisory liability claim against Sergeant Burkett and Chief Small.  Defendants argue that Plaintiff cannot demonstrate supervisory liability against either of them or the City of Daytona Beach for a violation of 42 U.S.C. § 1983 because Plaintiff has not proffered evidence demonstrating that there was a custom, policy, or practice encouraging officers to use excessive force in effecting arrests.  Plaintiff counters that he has provided the Court with

overwhelming evidence of complaints of excessive force and misconduct by the officers.  Furthermore, Plaintiff contends that the record reflects the police department's strong disciplinary indifference to excessive force complaints, that officers were never disciplined and were merely warned, and that the City's efforts to evaluate the claims were superficial.

To impose supervisory liability for failing to act to preserve a constitutional right under section 1983, Plaintiff must establish that his constitutional rights were violated, that the City had a policy or custom that constituted deliberate indifference to his rights, and that the violation was caused by the policy or custom.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  In the instant case, Plaintiff has provided evidence demonstrating that Defendant officers violated his right to be free from excessive use of force after he was arrested and subdued.[12]  Thus, the Court's analysis will focus on determining whether there is a municipal policy that sanctions the use of excessive force.

The crux of Plaintiff's supervisory liability claim focuses on inadequate training and supervision.  To prove that inadequate training and supervision is a municipal policy, Plaintiff must show that the City's failure to supervise its employees evidenced a "deliberate indifference" to the rights of the persons who interact with the employees.  *Id.* at 399.  Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions."  *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997).

---

[12]  The Court has already found that summary judgment is appropriate in favor of Defendant officers on Plaintiff's false arrest claim.  Because the Court has found that Defendant officers cannot be held liable for false arrest, Chief Small, Sergeant Burkett, and the City of Daytona Beach cannot be held liable for false arrest.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (explaining that Supreme Court case law did not authorize "the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

Plaintiff draws the Court's attention to the seventy-seven exhibits submitted in opposition to Defendants' Motion for Summary Judgment as the basis for his argument that the City had a custom or policy of permitting officers to use excessive force.[13]  These seventy-seven exhibits are dated over a nine year period and contain letters and memoranda involving complaints and investigations into those complaints concerning officers in the City of Daytona Beach Police Department.  Many of these documents do not address whether police officers used excessive force or unlawfully arrested individuals in discharging their duties.  For example, the memoranda address whether Office Vahey conducted a proper search of an impounded vehicle, whether Officer Goss violated Departmental Standards Directive 51.1 for keeping a civilian observer in his vehicle during a high speed pursuit, whether Office Goss made an improper evidence submission, whether Officer Goss properly counted and tagged currency that was seized, whether Officer Allen handled an individual who approached him regarding a stolen cell phone in an improper manner, and whether Officer Allen conducted a proper search of a vehicle prior to the time the Daytona Wrecker Service towed it to its yard.  (Doc. No. 68, Ex. 4, 11, 12, 28, 38, 43).  Several of the memoranda address other complaints of improper actions by the officers.  For example, the memoranda address whether Officer Vahey accidentally tased his daughter when testing his taser around his children, whether Officer Allen pointed a service weapon at a trainee in order to make a point regarding officer safety, whether Sergeant Burkett beat a complainant's girlfriend, whether an officer kicked a complainant in the stomach, and whether Sergeant Burkett battered his wife.[14]  (Doc. No. 68, Ex. 5, 22, 23, 24, 25, 48, 72).  The documents also

_____

[13] The Court has previously found that these exhibits are inadmissible because they have not been authenticated.

[14] The unauthenticated documents reflect that Officer Vahey was warned for neglecting his duty after accidentally discharging his taser on his child and that the claim against Officer

report investigations of excessive force allegations as unfounded.  (*See* Doc. No. 68, Ex. 51, 52, 56, 57, 58).  Only one exhibit demonstrates that Sergeant Burkett received a reprimand on July 11, 1995 for using excessive force.  (Doc. No. 68, Ex. 77).

Even assuming that Plaintiff had properly authenticated the seventy-seven exhibits and that they would be admissible into evidence, these exhibits fail to demonstrate a municipal policy condoning officers' use of excessive force.  First, the vast majority of the unauthenticated exhibits are unrelated to the use of excessive force by officers at the Daytona Beach Police Department.  A number of the exhibits detail the officers' actions in failing to comply with important administrative rules such as improperly searching vehicles or improper evidence submission.  (Doc. No. 68, Ex. 11, 12, 28, 38, 40, 43).  Many of them involve situations in which the officers were exonerated or the allegations were determined to be unfounded.  (*Id.* at Ex. 10, 15, 18, 27, 30, 34, 52, 57, 58, 59, 61, 70, 71).  Only nine of the seventy-seven exhibits touch on the issue of whether the officers used excessive force while arresting suspects.  (*Id.* at Ex. 35, 48, 51,52, 56, 57, 58, 72, 77).  These nine exhibits address six instances of alleged police abuse.  Of these nine exhibits, only one reflects that an allegation of excessive force against Sergeant Burkett was sustained.  (*Id.* at Ex. 77).  The other eight exhibits demonstrate that the allegations were determined to be unfounded in three of the other five instances of alleged police abuse.  (*Id.* at Ex. 35, 51, 52, 56, 57, 58).  There is no record of the outcome of the investigation of the other two instances.  (*Id.* at Ex. 48, 72).

The existence of one valid complaint is insufficient to establish an official municipal policy.

---

Allen involving an improper handling of a firearm during a training scenario was sustained. (Doc. No. 68, Ex. 7, 25).  There is no record of the outcome of Sergeant Burkett's purported action of beating the complainant's girlfriend or beating his wife.  There is also no record of the outcome of an officer's purported action of kicking a complainant in the stomach.

*See, e.g., Williams v. City of Albany*, 936 F.2d 1256, 1261 (11th Cir. 1991) ("The City may not be held accountable for a municipal police on the basis of a single incident nor may liability exist on the theory of *respondeat superior*.") (internal citations omitted); *see also Wideman v. Shallowford Co. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987) ("Moreover, proof of a single, isolated incident of unconstitutional activity generally is not sufficient to impose a municipal policy under *Monell*.") (internal citations omitted).

 While several exhibits detail alleged rude, aggressive, or unprofessional behavior by the officers or demonstrate a lack of judgment, none of these exhibits, even in combination with the exhibits that examine the use of force in an arrest context, demonstrate that the City had a pattern or practice of condoning excessive use of force.  (*Id.* at Ex. 5, 16, 22, 23, 24, 25, 64); *see Brooks v. Scheib*, 813 F.2d 1191, 1192, 1193 (11th Cir. 1987) (even though there had been ten citizen complaints regarding the defendant officer, the appellate court held that the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit...the number of complaints bears no relation to their validity."); *see also Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally, random or isolated incidents are insufficient to establish a custom or policy.") (internal citations omitted); *see also Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (finding that a series of incidents did not coalesce into a discernible policy where the events consisted of testimony from a witness regarding a police beating, the death of a prisoner in police custody and the medical examiner's conclusion that the death was caused by a choke-hold, the death of seven persons in incidents involving Washington, D.C. police, a fine imposed against an officer for striking two persons without cause, the reprimand of an officer for looping a belt around a victim, and the police chief's admission that an officer had kicked a handcuffed

suspect).

Even more importantly, Plaintiff has not proffered any evidence demonstrating that the City's efforts to evaluate the claims were so superficial that one could infer that the City was deliberately indifferent to the truth of the claims. *See, e.g., Fiacco v. City of Rensselear*, 783 F.2d 319, 328 (2d Cir. 1986) (explaining that if the city's efforts to evaluate excessive force claims "were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.")  In fact, many of the exhibits detail investigations made by the City of Daytona Beach Police Department as to whether officers violated departmental policies.

Because there is no evidence demonstrating that the City made a cursory investigation of the excessive force complaints and because the sustained complaints of excessive force are few in number over a period of years, the Court finds that even if the exhibits were admissible, they do not establish a municipal policy sanctioning the use of excessive force by officers.

Plaintiff also cites Exhibit 78 in support of his argument that the City has a policy of condoning excessive force.  Exhibit 78 is the affidavit of Frank Allen, counsel of record in this case.  Allen testified that in 1999 and 2000, he and John Dill represented two citizens of Daytona Beach in excessive force and false arrests civil rights cases.  (Doc. No. 68, Ex. 78, ¶ 2).  Allen averred that in both cases Daytona Beach Police officers used excessive force against his clients and falsely arrested them.  (*Id.* at ¶ 3).  Allen further stated that in 2000, a jury rendered a verdict against the City of Daytona Beach in an excessive force case.  (*Id.* at ¶ 4).  Allen has also attached a newspaper article which explains that the City of Daytona Beach settled three lawsuits involving claims for excessive force and false arrest.  (Doc. No. 68, Ex. A to Ex. 78).

Allen's affidavit is insufficient to establish the existence of a custom or policy because he is the attorney for the Plaintiff and is not shown to have personal knowledge of the matters asserted which involved his clients.  *See* FED. R. EVID. 602.  The fact that a jury in 2000 rendered a verdict against the City of Daytona Beach in an excessive force case does not mean that there was such custom or policy in effect at the time of the events in this case.  Further, the attached newspaper article does not establish the existence of a municipal policy because it is hearsay and also because cases may be settled for a variety of reasons.

Because the seventy-seven exhibits are not admissible due to the failure to authenticate them, and even if admissible they are insufficient to demonstrate the existence of a custom or policy of excessive force, summary judgment in favor of Defendant City of Daytona Beach, Sergeant Burkett, and Chief Small is appropriate on the supervisory liability claims.

### 7. Defendants' Argument that the Assault/Battery Claim is Barred by the Doctrine of Sovereign Immunity

Plaintiff seeks to hold Defendants Sault, Ruff, Vahey, Allen, Goss, and Burkett liable for assault and battery.  Defendants claim that the officers are entitled to immunity from Plaintiff's assault and battery claim under Florida Statutes, Section 768.28(9)(a) because the officers did not act in bad faith or with a malicious purpose or in a manner exhibiting a wanton and willful disregard of human rights.  Plaintiff counters that the officers acted in bad faith because they had no legal justification to beat Plaintiff or remove him from the patrol car after he was arrested and handcuffed and beat him again.

Section 768.28(9) provides that:

No officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a

result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting a wanton and willful disregard of human rights, safety, or property.

FLA. STAT. § 768.28(9) (2005).

The sovereign immunity statute generally protects government officials from individual liability for damages except if the government official "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* In the instant case, there is a genuine issue of material fact as to whether Defendant officers acted in a manner exhibiting a wanton and willful disregard of human rights for their actions after Plaintiff had been arrested, handcuffed, and subdued. Plaintiff testified that Defendant officers dragged him out of the police vehicle after he was already handcuffed and under arrest and that the officers kicked, punched, choked, and beat him. Such level of force applied to Plaintiff by the officers shows a wanton and willful disregard for human rights. *See, e.g., Thompson v. Douds*, 852 So.2d 299, 303, 309 (2d DCA 2003) (explaining that the officer's action of giving the subdued arrestee two or three "knee blasts" combined with another officer's action of using two "pain compliance techniques" on the subdued arrestee who eventually went into a persistent vegetative state constituted a wanton and willful disregard for human rights). Therefore, summary judgment is not appropriate on the assault and battery claim.

### 8. Defendants' Argument that the Doctrine of Sovereign Immunity Bars the Negligent Training/Supervision Claim

Plaintiff seeks to hold Defendants Small and the City of Daytona Beach liable for negligent training and supervision. Defendants argue that recovery on such a theory of negligence is barred by

the doctrine of sovereign immunity.  Plaintiff counters that he has specifically challenged the implementation of the training of the officers involved in this case.  Plaintiff claims that the implementation of the training program is not protected by sovereign immunity and that the record reflects that the implementation of the program is deficient.

The Florida Supreme Court has held that even if a plaintiff adequately demonstrates all the elements of a negligence claim, governmental liability does not exist when the challenged action is "discretionary" rather than "operational" in nature.  *Kaisner v. Kolb*, 543 So.2d 732, 736 (Fla. 1989). Discretionary actions involve an exercise of executive or legislative power such that court intervention by way of tort law would be an inappropriate entanglement in fundamental issues of public policy and planning.  *Id.* at 737.  An action is discretionary and will be insulated from tort liability when (1) the challenged action necessarily involves a basic governmental policy, program, or objective; (2) the challenged action is essential to the realization or accomplishment of that policy, program, or objective; (3) the challenged action requires the exercise of basic policy evaluations, judgments, and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision.  *See id.* at 736.  In contrast, operational actions are not necessary to public policy or planning but merely reflect a second decision as to how those policies or plans will be implemented.  *Id.* at 737.

There are two reasons why Plaintiff's negligent training and supervision claim is defective. First, Plaintiff, who bears the burden of proof, has not brought forth any evidence creating a genuine issue of material fact as to whether Defendants negligently trained and supervised the officers.  Rather, Defendants have produced unrefuted evidence demonstrating that they trained their officers in the

proper use of force.  Plaintiff now bears the burden to produce evidence creating a genuine issue of material fact as to whether Defendant negligently trained and supervised the officers.  Plaintiff has failed to do so.

Second, in his summary judgment brief, Plaintiff has refined the negligent training and supervision claim from the claim alleged in the complaint.  In his complaint, Plaintiff alleges that Defendant Small and the City of Daytona Beach breached their duty to him by failing to adequately train and supervise Defendant officers regarding how to lawfully stop and interact with citizens.  (Doc. No. 38, ¶81).  While the complaint contends that Plaintiff's injuries resulted from improper implementation of policies and procedures, in his response to Defendants' Motion for Summary Judgment Plaintiff argues that the City is liable because Sergeant Griffin testified that the City did not initially utilize "role play" training scenarios.  (Doc. No. 68, Ex. 81, p. 9) (Doc. No. 66, p. 19).  In his response brief, Plaintiff is clearly challenging the content and nature of the training program itself which is a basic discretionary function for which the government is entitled to immunity.  *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001) ("A city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning."); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (explaining that in order for the plaintiff to state a claim for negligent training, he must show that the defendant city was negligent in the implementation or operation of the training program and cannot merely challenge the content of the program).  Thus, summary judgment is appropriate in favor of Defendant Small and Defendant City of Daytona Beach on the negligent training and supervision claim.

### 9. Defendants' Argument that the Record Reflects Probable Cause to Arrest Plaintiff Requiring

### *Dismissal of the False Arrest/Imprisonment Claim*

Plaintiff seeks to hold all Defendants liable for false arrest and false imprisonment under state law.  Defendants argue that because the record reflects that Defendant officers had probable cause to arrest Plaintiff, the Court should dismiss the false arrest and false imprisonment claim.  The Court has already found that there is no genuine issue of material fact as to whether Defendant officers had probable cause to arrest Plaintiff for resisting arrest without violence and for violating Florida Statutes, Section 316.193.  Therefore, the Court grants summary judgment in favor of Defendants on the false arrest and false imprisonment count.

### *10. Defendants' Argument that They Are Not Liable for Intentional Infliction of Emotional Distress Because the Officers' Conduct Does Not Meet the Elements of the Tort*

Plaintiff seeks to hold Defendants Sault, Ruff, Vahey, Allen, Goss, and Burkett liable for intentional infliction of emotional distress.  Without citing any case law, Defendants argue that the facts of this case reveal that the actions taken by the officers do not rise to the level necessary to state a claim for intentional infliction of emotional distress.

The Florida Supreme Court first recognized the tort of intentional infliction of emotional distress in 1985.  *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985).  To maintain such claim, a plaintiff must establish that (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior knowing, or he should have known, that emotional distress would likely result; (2) the conduct was outrageous, that is, it goes beyond all bounds of decency, and is regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.  *Clement v. Horne*, 707 So.2d 865, 866 (Fla. 3d DCA 1998)

(citing *Dominguez v. Equitable Life Assur. Soc. of U.S.*, 438 So.2d 58, 59 (Fla. 3d DCA 1983)).  The

issue of whether allegations rise to the level of outrageous conduct is a question of law, not of fact, and

is determined by the Court.  *Ponton v. Scarfon*, 468 So.2d 1009, 1011 (Fla. 2d DCA 1985); *Baker v.*

*Florida Nat'l Bank*, 559 So.2d 284, 287 (Fla. 4th DCA 1990).

In the instant case, Plaintiff testified that Defendant officers choked, kicked, and punched him

after he had already been handcuffed, subdued, and arrested.  Because these facts are sufficient to

demonstrate extreme and outrageous conduct that goes beyond all normal bounds of decency, the

Court finds that Defendants' argument that the facts of this case do not state a claim for intentional

infliction of emotional distress as a matter of law is without merit.  *See, e.g., Johnson v. State Dept. of*

*Health Rehab. Serv.*, 695 So.2d 927, 930 (Fla. 2d DCA 1997) (allegations involving officers'

unjustified and unexplained taking of the plaintiff's children while attending church services, choking

the plaintiff until she lost consciousness, throwing her to the ground, and arresting her for challenging

the officers' legal authority stated a claim for intentional infliction of emotional distress).

### 11.  Defendants' Argument that the Negligent Infliction of Emotional Distress Claim is barred by Florida Statutes Section 768.28(9)

Plaintiff asserts a claim for negligent infliction of emotional distress against all Defendants.

Defendants argue that the Court should dismiss the negligent infliction for emotional distress claim on

the basis of Florida Statutes, Section 768.28(9), which provides state officers with immunity for

actions committed in the scope of employment when such actions do not evince wanton or wilful

disregard or bad faith or a malicious purpose.

The Court has found that the record reflects a genuine issue of material fact as to whether

Defendant officers engaged in extreme and outrageous conduct.  Such a finding would preclude the

application of section 768.28(9) to bar the negligent infliction of emotional distress claim.  *See, e.g.,*

*Williams v. City of Minneola*, 619 SO.2d 983 (5th DCA 1993) ("Thus, we conclude that, if the jury

found that the appellees' conduct supported a claim for outrageous infliction of emotional distress by

reckless conduct, this conduct would at least constitute willful and wanton conduct under section

768.28(9)).  Therefore, the Court finds that Defendants' argument that the Court should dismiss the

negligent infliction for emotional distress claim on the basis of section 768.28(9) is without merit.

### 12. Defendant City of Daytona Beach's Argument that the City cannot be held Liable for Negligent Infliction of Emotional Distress Because the Officers' Decisions Regarding How to Effectuate the Arrest are a Police Power

Defendant City of Daytona Beach argues that the Court must dismiss the negligent infliction of

emotional distress claim because the officers' decision to arrest Plaintiff is discretionary and enjoys

immunity from liability.  Defendant further claims that Plaintiff is attempting to assert a cause of

action for negligent arrest which is not recognized under Florida law.

The basis of Defendant's argument is that Plaintiff's claim focuses on the decision to arrest and

not the actions that occurred after the arrest.  The crux of Plaintiff's claim, however, focuses on the

actions that occurred after Plaintiff was handcuffed and arrested when he was beaten, kicked, and

choked by Defendant officers.  These actions will form the basis of the Court's analysis.

The Court applies the factors articulated in *Kaisner v. Kolb*, 534 So.2d 732, 736 (Fla. 1989), to

determine whether the negligent infliction of emotional distress claim is discretionary and thus

protected under Florida law.[15]  None of these factors are met.  First, the officers' actions did not

involve a basic governmental policy, program or objective because the decision as to whether to beat,

---

[15] *See supra* section 8 of this Order.

kick, and choke a subdued arrestee is "not necessary to or inherent in policy or planning," and "merely reflects a secondary decision as to how those policies or plans will be implemented." *Id.* at 737. Second, the challenged actions were not essential to the realization of a basic governmental policy because other less forceful methods may exist to protect the officers and a subdued arrestee. *See id.* Finally, the actions did not require basic policy evaluation or expertise. *Id.* Rather, they required an assessment of how to implement policy. *Id.* Because the record reflects that the *Kaisner* factors have not been satisfied, the Court finds that Defendant City of Daytona Beach's argument that the negligent infliction of emotional distress claim against it is barred because it is discretionary in nature is without merit.[16]

### Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part as follows  (Doc. No. 53, filed on December 1, 2005):

---

[16] In *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262-65 (11th Cir. 2001), the Eleventh Circuit examined the application of the *Kaisner* factors to a negligent use of firearm claim:

> First, the officers' action did not involve a basic governmental policy, program or objective.  Indeed, the decision as to whether use of a firearm is necessary is "not necessary to or inherent in policy or planning," and "merely reflects a secondary decision as to how those policies or plans will be implemented.  *Kaisner*, 543 So.2d at 737. Second, the challenged actions were not essential to the realization of a basic governmental policy.  *See id.*  ("Safer places or methods of ordering motorists may exist that would both protect the motorists and meet the government's objectives.").  Finally, the actions did not require basic policy evaluation or expertise, rather, they required an assessment of how to implement policy.  *Id.*  ("This lawsuit merely asks the courts to consider the way in which this basic policy is implemented, not its fundamental wisdom.").

*Id.* at 1264.

(a)     The Court **GRANTS** Defendants' Motion for Summary Judgment as to the false arrest claim under 42 U.S.C. section 1983 against all Defendants;

(b)     The Court **GRANTS** Defendants' Motion for Summary Judgment regarding the excessive force claim as to whether Defendants Sault, Ruff, Vahey, Allen, Goss, and Burkett used excessive force in effectuating the arrest of Plaintiff;

(c)     The Court **DENIES** Defendants' Motion for Summary Judgment regarding the excessive force claim as to whether Defendants Sault, Ruff, Vahey, Allen, Goss, and Burkett used excessive force on Plaintiff after he was arrested, handcuffed, and subdued;

(d)     The Court **GRANTS** Defendants' Motion for Summary Judgment on Counts VII and VIII as to whether Defendants Small and Burkett are liable for false arrest based on a supervisory liability theory;

(e)     The Court **DENIES** Defendants' Motion for Summary Judgment on Counts VII and VIII as to whether Defendants Small and Burkett are liable for excessive force based on a supervisory liability theory;

(f)     The Court **GRANTS** Defendants' Motion for Summary Judgment on Count IX, the false arrest/imprisonment claim under state law;

(g)     The Court **DENIES** Defendants' Motion for Summary Judgment on Count X, the assault and battery claim;

(h)     The Court **GRANTS** Defendants' Motion for Summary Judgment on Count XI, the negligent training and supervision claim;

(i)     The Court **DENIES** Defendants' Motion for Summary Judgment on Count XII, the

intentional infliction of emotional distress claim; and

(j)     The Court **DENIES** Defendants' Motion for Summary Judgment on Count XIII, the

negligent infliction of emotional distress claim.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on February _15,_____ 2006.

_____

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record

-46-